UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| KWANG YONG SHIN,<br><br>Plaintiff,<br><br>v.<br><br>SUN POULTRY SERVICES INC.,<br><br>Defendant. | Case No. 2:25-cv-00003<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Luke A. Evans |

To: The Honorable Waverly D. Crenshaw, Jr., District Judge

**REPORT AND RECOMMENDATION**

For about seven years, plaintiff Kwang Yong Shin worked as a chicken sexer in a facility operated by defendant Sun Poultry Services Inc. Over that time, plaintiff became increasingly concerned by reports and rumors that he heard around the facility that older Korean workers gradually were being phased out in favor of younger Mexican workers. No representative of defendant ever told plaintiff that his job was in danger, but plaintiff's concern eventually led to litigation that was dismissed in Georgia. While an appeal of that litigation was pending, a series of events occurred that caused defendant to believe that plaintiff voluntarily resigned from his job. Plaintiff denies voluntary resignation and instead commenced this action, alleging unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2000e-17; and the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634.

The parties now have filed cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Doc. Nos. 89, 100.) For the reasons below, the Court respectfully recommends denying plaintiff's motion and granting defendant's motion in part.

## I. Background

### A. Factual Background

This case concerns allegations that defendant discriminated against plaintiff based on race and age and retaliated against him for pursuing litigation. Plaintiff immigrated to the United States from South Korea in 1997 and worked from 1997 to 2024 as a chicken sexer. (Doc. No. 97-2 at 31.) Plaintiff worked for various companies before joining defendant around 2017. (Doc. No. 97-2 at 43.) The record is not clear as to whether plaintiff had a written contract in his first few years of employment with defendant, but by November 2021, the parties entered a contract titled an independent contractor services agreement (the Agreement). (Doc. No. 89-1 at 3–6.) Among other provisions, paragraph 2 of the Agreement defined plaintiff as an independent contractor "in exclusive control of how the Services this Agreement provide for will be accomplished." (Doc. No. 89-1 at 3.) Paragraphs 3 and 4 contained non-compete and non-solicitation language prohibiting plaintiff from working for anyone else at the same time or from diverting defendant's business to anyone else. (Doc. No. 89-1 at 3–4.) Under paragraph 8, the Agreement lasted for an initial term of two years but would be "deemed renewed for successive one (1) year periods unless notice of termination is received at least thirty (30) days prior to the termination date." (Doc. No. 89-1 at 4.) Paragraph 9 contained termination language and required plaintiff to notify defendant "in writing, thirty (30) days in advance to terminate this Agreement." (Doc. No. 89-1 at 4.) At the same time, defendant could terminate the Agreement immediately if plaintiff failed "to comply with the terms of this Agreement." (Doc. No. 89-1 at 4.) Plaintiff's schedule varied based on production needs, but he typically worked four days a week. (Doc. No. 97-2 at 82.) Defendant did not pay benefits or provide any instructions on how to do the job, but managers would provide feedback about production needs or about work quality. (Doc. No. 97-2 at 83–87.) Cell phone usage was restricted. (Doc. No. 97-2 at 56–57.) As for equipment, plaintiff provided his own

magnifying glasses and lamp, but defendant provided all other arrangements including the facility location, "electricity, uniform, the table where we sort the chicks, and the cabinet, and water." (Doc. No. 97-2 at 89.) Managers would set break times, and plaintiff could be penalized for not following the work and break schedule. (Doc. No. 97-2 at 90.) Regardless of the provisions of the Agreement, plaintiff always considered himself an employee of defendant because defendant "treated me like [an] employee but not as their independent contractor." (Doc. No. 97-2 at 116.)

The record is not clear about chronology or the exact sequence of events, but at some point, plaintiff began to feel that defendant was discriminating against him. Plaintiff had heard, "in a conversation float around" the facility, that defendant was phasing out older Korean chicken sexers in favor of younger Mexican workers. As plaintiff stated at his deposition, "[t]here is no evidence here today, but it—it was obvious there was a many employee who are sorter with the older ages [sic]. They were let go and more Mexican people were replacing them and it was—it was just obvious that it was happening." (Doc. No. 97-2 at 104.) Plaintiff also made his own observation that "I had to face the reality `cause three years ago I was 61 and I saw six or five, the sorter who are at 63, 64, so those sorters who are over 60s were letting go [sic]. So for me it was a reality." (Doc. No. 97-2 at 104.) Plaintiff additionally was aware of rumors that older Korean chicken sexers at other facilities that defendant operated had been terminated. (Doc. No. 97-2 at 106.) Defendant's hatchery leader, Yon Ok Casey (Casey), allegedly told plaintiff once that some older Korean workers were being replaced by younger workers from Mexico. (Doc. No. 97-2 at 108.) Around 2023 or 2024, after hearing reports about layoffs, plaintiff disclosed to Casey that he had litigation pending against defendant. (Doc. No. 97-2 at 110–11.)[1]

---

[1] *Kwang Young Shin v. Sun Poultry Servs., Inc.*, No. 1:23-cv-04439 (N.D. Ga.). For the sake of brevity, the Court will incorporate by reference the summary of plaintiff's Georgia litigation

By May 30, 2024, plaintiff's employment at defendant ended, but the parties dispute how it ended. Plaintiff testified at his deposition that he was told to leave defendant by May 30, 2024. (Doc. No. 97-2 at 117.) After May 30, 2024, plaintiff no longer had access to defendant's facility. (Doc. No. 97-2 at 117.) Plaintiff's theory of liability is that the May 30, 2024 separation was not prompted by any action on his part and was both retaliation for his Georgia litigation and a continuation of defendant's efforts to eliminate older Korean workers. In contrast, Casey has submitted a declaration that plaintiff spoke to her on the evening of March 7, 2024 and verbally told her "that he was resigning from his position, that he could no longer work for Sun Poultry, that he was hired by a warehouse in Atlanta, Georgia, and that his last day with the Company would be May 30, 2024." (Doc. No. 97-3 at 1.) The next morning, Casey informed defendant's vice president of the resignation and of the need to find someone as skilled as plaintiff. (Doc. No. 97-3 at 2; Doc. No. 98-3 at 2–3.) On May 13, 2024, plaintiff sent a text message to Jin Min Chun, a human resources representative at defendant. (Doc. No. 89-14 at 1–2.) The text message was written in Korean, and plaintiff did not provide an English translation, but he has not disputed defendant's translation of the message as, "I apologize, Mr. Jeon [Jin], but I will continue working." (Doc. No. 89-14 at 2; Doc. No. 97 at 15.) That translation corresponds with plaintiff's description that he stated that he intended to continue working. (Doc. No. 89-14 at 1.) The text message presupposes that something happened before May 13, 2024 that would have given defendant a reason to believe that plaintiff did not intend to continue his employment. Nonetheless, Plaintiff has denied verbally resigning to Casey and has asserted that, if Casey understood him to have resigned at any point, she misunderstood him. (Doc. No. 97-2 at 118.)

---

described in the adopted June 2, 2025 report and recommendation from Magistrate Judge Newbern. (Doc. No. 47.)

At his deposition, plaintiff explained the basis of his claims under Title VII and the ADEA. Plaintiff commenced this case by filing his complaint on January 9, 2025, asserting both unlawful discrimination and retaliation under each statute. (Doc. No. 1.) When asked why he believed he was facing discrimination on the basis of age, plaintiff replied, "I wasn't discriminated against directly, but looking at the reality of what was going on, [other employees and I were] always anxious that we'll be next person [sic]." (Doc. No. 97-2 at 158.) Plaintiff stated generally that defendant had a financial incentive to hire illegal Mexican workers over older Korean workers. (Doc. No. 97-2 at 159.) With respect to retaliation, plaintiff asserted that his whistleblowing activities consisted of his prior litigation. (Doc. No. 97-2 at 161.) Plaintiff received his right-to-sue letter for this case from the Equal Employment Opportunity Commission (EEOC) on or around January 6, 2025. (Doc. No. 1-1 at 1.)

### B. The Pending Motions

Plaintiff filed his motion for summary judgment on March 5, 2026. Plaintiff argues that he has established unlawful retaliation as a matter of law by showing that he separated from defendant on May 30, 2024 while he had an appeal pending from his Georgia litigation. (Doc. No. 89 at 3, 9–11.) Plaintiff argues further that, regardless of labels, he was an employee of defendant and not an independent contractor because defendant controlled work assignments, scheduling, access to facilities, the timing of salary payments, and compliance with company rules and safety protocols. (Doc. No. 89 at 11; Doc. No. 98 at 3.) In support of his argument about control, plaintiff has attached to his motion an orientation checklist that he believes shows a level of control over work conditions more appropriate to employees than to independent contractors. (Doc. No. 89-1 at 11.) Defendant opposes the motion on procedural and substantive grounds. Procedurally, defendant notes that plaintiff did not submit a statement of undisputed material facts as required by Local

Rule 56.01(c);[2] or any exhibits in admissible form that would substantiate his allegations and show entitlement to summary judgment. (Doc. No. 97 at 2.) On substance, defendant argues that plaintiff in fact was an independent contractor given latitude in scheduling based on his training and experience in a highly specialized job function. (Doc. No. 97 at 11.) Alternatively, even if plaintiff could be considered an employee, defendant argues that plaintiff submitted a verbal resignation to Casey on March 7, 2024 and that the May 13, 2024 text message would not have been necessary unless plaintiff had signaled a willingness to leave employment. (Doc. No. 97 at 14–15; Doc. No. 97-3 at 2.) Defendant argues that the verbal resignation—regardless of any noncompliance with paragraph 9 of the Agreement—created a nondiscriminatory reason for the separation that had no causal connection to any complaints that he filed with the EEOC. (Doc. No. 97 at 15–18.) Despite plaintiff's apparent change in decision, defendant argues that it simply chose to stand by its decision to accept the verbal resignation. (Doc. No. 97-1 at 3.)

Defendant filed its motion for summary judgment on June 15, 2026. Defendant argues that plaintiff's claims fail as a matter of law because he was an independent contractor, and both Title VII and the ADEA apply only to employees. (Doc. No. 101 at 7–10.) Defendant also asserts that the way in which plaintiff's prior litigation in Georgia ended—a prior EEOC complaint, followed by a complaint dismissed without prejudice for failure to serve defendant and for failure to prosecute—means that any allegations tied to events occurring before January 10, 2024 are time-barred. (Doc. No. 101 at 11.) According to defendant, plaintiff is limited to claims arising from events occurring on or after January 10, 2024. With respect to plaintiff's allegations that defendant was phasing out older Korean workers in favor of younger Mexican workers, some of whom might

---

[2] In reply, plaintiff asserts that his motion included undisputed material facts. (Doc. No. 98 at 1.)

have been in the country illegally, defendant addresses the allegations in several ways. To the extent that plaintiff argues about discrimination based on citizenship, defendant argues that Title VII addresses national origin but not citizenship. (Doc. No. 101 at 13–14.) Defendant argues that plaintiff never suffered an adverse employment action; instead, plaintiff's separation occurred only because he had a conversation with Casey around March 7, 2024 that caused her to believe that he resigned from his position. (Doc. No. 101 at 15.) Defendant argues further that plaintiff is relying entirely on speculation and gossip to suggest that similarly situated employees outside of his protected class were treated more favorably. (Doc. No. 101 at 16–17.) Finally, defendant argues that plaintiff's March 7, 2024 conversation with Casey reasonably caused defendant to believe that he resigned his position, which means that plaintiff created a non-discriminatory reason for his separation and that there was no causal connection, needed for a retaliation claim, between any protected activity and the separation. (Doc. No. 101 at 17–25.) Plaintiff opposes the motion by pointing to factual questions about his working conditions that cast doubt on his status as an independent contractor. (Doc. No. 103 at 5–9.) Plaintiff also points to his text message from May 13, 2024 as well as a text message from defendant a few days earlier as clear indications that he intended to continue working; to the extent that plaintiff denies ever having any job or other connection to Atlanta, he appears to be suggesting that any communication between him and Casey around March 7, 2024 either did not happen at all or were significantly misunderstood. (Doc. No. 103 at 11–16.) Finally, plaintiff asserts that the Agreement would have required a resignation in writing, and "Defendant has failed to produce any resignation letter, HR record, termination document, or any direct communication from Plaintiff expressing an intent to resign." (Doc. No. 103 at 19.)

## II. Discussion

### A. Summary Judgment Generally

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Parties must cite to depositions, documents, affidavits, or other materials in the record to show that a material fact can or cannot be genuinely disputed. *See* Fed. R. Civ. P. 56(c)(1). The Court also may consider materials in the record that the parties have not cited. Fed. R. Civ. P. 56(c)(3). "The court must read the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party." *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (citation omitted). "In undertaking this inquiry, credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

The Court also notes that the parties have cross-motions for summary judgment pending. "Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on the other motion." *NetJets Large Aircraft, Inc. v. United States*, 80 F. Supp. 3d 743, 747 (S.D. Ohio 2015). "When reviewing cross-motions for summary judgment, the court must evaluate each

motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citation omitted).

**B. Questions of Fact About Plaintiff's Independent Contractor Status**

The Court first will assess plaintiff's employment relationship with defendant because "the federal employment discrimination statutes protect employees, but not independent contractors." *Shah v. Deaconess Hosp.*, 355 F.3d 496, 499 (6th Cir. 2004) (citations omitted). When assessing whether a party had been an employee or an independent contractor, courts look to the common law of agency "no matter how the parties characterize the relationship." *Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 355 (6th Cir. 2011). A review of agency can incorporate any number of factors, with no single factor being decisive:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992) (citations omitted). As applied here, several of the commonly considered agency factors are mixed. The parties do not dispute that plaintiff has a high degree of technical skill and that defendant did not provide any technical training. The parties also do not dispute that plaintiff had to provide his own magnifying glasses and lamp but that the work always occurred at defendant's facilities and that defendant furnished all other work accommodations, including biosecurity rules and bioprotective clothing. *Cf. Peters v. O'Malley*, No. 2:13-00103, 2015 WL 12531995, at *2 (M.D. Tenn. Feb. 20, 2015) (denying summary judgment as to independent-contractor status, where a radiologist used the hiring party's

facilities and staff and was required to meet certain turnaround times); *Crouch v. Guardian Angel Nursing, Inc.*, No. CIV.A. 3:07-CV-00541, 2009 WL 3737887, at *17 (M.D. Tenn. Nov. 4, 2009) (licensed practical nurses were employees and not independent contractors in part because hiring party's investment in the business outweighed nurses' investment in tools of their trade). Plaintiff's work was an important part of defendant's regular business, and while defendant has asserted that it did not assign plaintiff a specific schedule, plaintiff testified at his deposition that his managers had discretion to tell him to improve his work if too many chicks died during sexing and to increase output if defendant needed work done at a faster pace. (Doc. No. 97-2 at 84.) *Cf. Keller v. Miri Microsystems LLC*, 781 F.3d 799, 814 (6th Cir. 2015) (reversing summary judgment in fair-labor case and remanding for trial, where questions of fact surrounded whether technician had an exclusive relationship with the hiring party; the degree to which the hiring party controlled scheduling; and how much the hiring party provided in facilities and staffing).

Other factors raise questions of fact as well. The Agreement contained both non-compete and non-solicitation provisions. Plaintiff testified that his managers set break times and start times; restricted cell phone usage; and could penalize him for not following those times. (Doc. No. 97-2 at 56–57, 90.) *Cf. Rayford v. Mobile Phlebotomy of Cent. Michigan LLC*, 729 F. Supp. 3d 724, 730 n.2 (E.D. Mich. 2024) (noting without deciding that independent-contractor status was not clear-cut, where phlebotomists testified that the hiring party controlled schedules, limited cell phone usage, required uniforms, and required non-compete agreements). Plaintiff had to follow an orientation checklist covering numerous workplace rules and procedures. (Doc. No. 89-1 at 11.) With respect to compensation, there are documents in the record consistent with an arrangement that the withholdings typically associated with employees would not occur here. (Doc. No. 89-1 at 7–8.) Nonetheless, the record contains no pay stubs for checks issued (*see, e.g.,* Doc. No. 89-12

at 2) and appears to be ambiguous about how much plaintiff actually was paid per chick inspected and whether any withholdings or other employee-like payroll management actually occurred. Finally, paragraph 9 of the Agreement gave defendant the authority to terminate plaintiff immediately for any failure to comply with the Agreement's terms. *Cf. Benion v. LeCom, Inc.*, 336 F. Supp. 3d 829, 852 (E.D. Mich. 2018) (partial summary judgment granted to workers as to employee status; factors supporting employee status included presence of a non-compete clause and the hiring party's ability to terminate employment for any reason).

The two cases that defendant has cited specifically about independent contractors do not change the above analysis. Neither *Saiki v. United States*, 306 F.2d 642 (8th Cir. 1962), nor *Aparacor, Inc. v. United States*, 556 F.2d 1004 (Ct. Cl. 1977), stand for any categorical principles concerning independent contractors.[3] Each case rests on the particular facts of the relationship between the parties, and those facts do not necessarily align with the facts here.

Under these circumstances, the Court finds that there are questions of fact that preclude ruling as a matter of law whether plaintiff was an independent contractor, regardless of the provisions of the Agreement. Accordingly, the Court recommends denying summary judgment to either party on the issue of independent-contractor status.

**C. Unlawful Discrimination Under Title VII and the ADEA**

Assuming alternatively, for the limited purpose of adjudicating the pending motions, that plaintiff was an employee, the Court will review plaintiff's allegations of unlawful discrimination based on race and age.[4] Under either Title VII or the ADEA, courts evaluate claims based on

---

[3] In its briefing, defendant indicates that both cases were specifically about chicken sexers. (Doc. No. 101 at 9.) *Saiki* did concern chicken sexers, but *Aparacor* was about "the business of designing and supplying merchandise, principally women's apparel." 556 F.2d at 1006.

[4] Although defendant has included an argument in its briefing about discrimination based on citizenship, the Court will defer to the designation in the complaint that the alleged discrimination

whether a plaintiff is presenting direct or circumstantial evidence. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018) (citations omitted); *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (citations omitted); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (citations omitted). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citations omitted). If a plaintiff proceeds by direct evidence then the employer has the burden to demonstrate that it would have taken the same action even if it had not been motivated by discrimination. *See Geiger*, 579 F.3d at 621 (citations omitted). If a plaintiff proceeds by circumstantial evidence then "the plaintiff must make out a prima facie case of race [or age] discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009) (citations omitted). To make a prima facie case of discrimination, a plaintiff must show "1) that he is a member of a protected group, 2) that he was subject to an adverse employment decision, 3) that he was qualified for the position, and 4) that he was replaced by a person outside of the protected class." *Kline v.*

---

and retaliation occurred on the basis of race and age. (Doc. No. 1 at 4.) Additionally, the Court interprets the complaint and plaintiff's motion papers as focused entirely on his separation from employment, meaning that it need not address defendant's arguments about timeliness (Doc. No. 101 at 10–11).

*Tennessee Valley Auth.*, 128 F.3d 337, 349 (6th Cir. 1997) (internal block quotation and citations omitted).

The record here does not support any assertion of discriminatory animus or of an adverse employment action through direct or circumstantial evidence. Plaintiff has not submitted any evidence that defendant changed his job functions, work titles, or compensation in any way. *Cf. Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (affirming summary judgment for employer on Title VII claims where, *inter alia*, no materially adverse employment action occurred). Instead, the record contains numerous statements from defendant to the effect that he heard around the facility that defendant gradually was phasing out older Korean chicken sexers in favor of younger Mexican workers. (*See, e.g.*, Doc. No. 97-2 at 106 ("A: And those were Koreans, five and six people, they were all let go and they were over age 60. Q: How do you know they were let go? A: The rumor spread all over. Q: Okay. Who spread that rumor? Who told you? A: There was not one person who spread it. It just spread all at once. So everybody knew about it.").) Plaintiff appears not to have conducted any depositions that would have substantiated what he claims to have heard around the facility. *See Hill v. TK Elevator Mfg., Inc.*, No. 24-5949, 2025 WL 2613306, at *4 (6th Cir. Sept. 10, 2025) (unpublished opinion) (affirming summary judgment for employer on Title VII and other claims, in part because inadmissible hearsay cannot be used to defeat summary judgment). Plaintiff decided on his own that he "had to face the reality" that the replacement of workers eventually would reach him, but he testified that no one from management told him directly that his job was in any danger. (Doc. No. 97-2 at 104.) *Cf. Woythal v. Tex-Tenn Corp.*, 910 F. Supp. 368, 375 (E.D. Tenn. 1995) (summary judgment granted on the ADEA claims, where employer never pressured plaintiff to retire, and rumors about plaintiff's retirement were too ambiguous or abstract). Plaintiff alternately has denied telling Casey that he

resigned and asserted that Casey misunderstood him (Doc. No. 97-2 at 118), but Casey's text message to defendant's vice president relaying the resignation, and plaintiff's May 13, 2024 text message attempting to reverse the resignation (Doc. No. 97-3 at 2), would make no sense unless something happened around March 7, 2024 that caused defendant to believe that plaintiff would be separating.

In the absence of any direct or circumstantial evidence that defendant forced out plaintiff, the record leaves no factual dispute that plaintiff's separation was a voluntary resignation and that he suffered no adverse employment action. *See Perry v. City of Jackson*, No. 1:23-CV-01254-JDB-JAY, 2024 WL 4163516, at *3 (W.D. Tenn. Aug. 21, 2024) ("A voluntary resignation is not an adverse employment action.") (internal quotation marks and citations omitted), *report and recommendation adopted*, No. 1:23-CV-01254-JDB-JAY, 2024 WL 4151164 (W.D. Tenn. Sept. 11, 2024). To the extent that neither party appears to have followed the termination provision in paragraph 9 of the Agreement, the Court cannot rule out—and need not address—whether that failure could give rise to some kind of claim for breach of contract. In any event, any failure to follow the procedures for termination in paragraph 9 does not, by itself, implicate Title VII or the ADEA. *Cf. White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) ("In any event, an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext.") (citations omitted). The Court thus recommends granting summary judgment to defendant with respect to plaintiff's claims of unlawful discrimination under Title VII and the ADEA.

**D. Retaliation Under Title VII and the ADEA**

Assuming again, for the limited purpose of adjudicating the pending motions, that plaintiff was an employee, the Court will review plaintiff's allegations of retaliation. "The elements of a retaliation claim are similar but distinct from those of a discrimination claim." *Laster v. City of*

*Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). To establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) he engaged in activity protected by Title VII [or the ADEA]; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007) (unpublished opinion) (citations omitted). Assuming without deciding that plaintiff would satisfy the first two elements, he cannot satisfy the last two elements. As noted above, the record leaves no dispute that plaintiff made some kind of communication to defendant indicating a decision to separate from employment. Subsequent attempts to reverse the decision or to claim a misunderstanding do not change how defendant reacted at the time. *See Feimster v. Henderson*, 25 F. App'x 274, 275 (6th Cir. 2001) (unpublished opinion) (affirming dismissal of Title VII retaliation claim, where plaintiff voluntarily resigned and subsequently was denied reinstatement); *see also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (affirming summary judgment to employer on age-discrimination claim, where "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect") (citation omitted). Plaintiff has not submitted any other evidence of any other action that defendant took, such as a change in compensation, duties, or work conditions, that could be considered a materially adverse action. Consequently, the Court recommends denying plaintiff's motion and granting summary judgment to defendant with respect to plaintiff's claims of retaliation under Title VII and the ADEA.

## III. Recommendation

For all of the foregoing reasons, the Court respectfully recommends denying plaintiff's motion for summary judgment (Doc. No. 89) and granting defendant's motion for summary judgment (Doc. No. 100) in part to close the case.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 23rd day of October, 2026.

LUKE A. EVANS
United States Magistrate Judge